2026 IL App (1st) 231754-U

SECOND DIVISION
February 24, 2026

No. 1-23-1754

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 224000942 |
| | ) | |
| ANTONIO DAVIS, | ) | Honorable |
| | ) | Rouhy Shalabi, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Defendant's speedy trial rights were not violated and his attorney was not ineffective for failing to move to dismiss on this basis; (2) the State failed to prove the unlawful possession of adult use cannabis by a driver of a vehicle; and (3) the evidence was sufficient to prove beyond a reasonable doubt that defendant committed the other minor traffic-related offenses.

¶ 2     Following a bench trial, defendant Antonio Davis was convicted of the following misdemeanor offenses: unlawful possession of adult use cannabis by a driver of a vehicle (625 ILCS 5/11-502.15 (West 2022)); unsafe backing on a roadway (625 ILCS 5/11-1402 (West 2022)); failure to notify of damage caused by a motor vehicle crash (625 ILCS 5/11-404 (West

2022)); transportation of alcohol by a driver (625 ILCS 5/11-502 (West 2022)); and driving on a suspended license (625 ILCS 5/6-303 (West 2022)). The trial court subsequently sentenced defendant to 12 months of supervision and 240 hours of community service.

¶ 3    On appeal, defendant argues that: (1) his trial counsel was ineffective for failing to move to dismiss the above charges based on a violation of his right to a speedy trial under the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5 (West 2022)); (2) the State failed to prove defendant guilty beyond a reasonable doubt of possession of cannabis by a driver; and (3) the State failed to prove defendant was the driver of the vehicle, an essential element of the remaining offenses.

¶ 4    In February 2022, the Berwyn police department filed a misdemeanor complaint against defendant for possession of cannabis by a driver. Additionally, five traffic tickets were issued for improper backing, failure of duties upon damaging unattended property, transportation of alcoholic liquor by a driver, operating an uninsured motor vehicle[1], and driving on a suspended license. The public defender was appointed to represent defendant in March 2022.

¶ 5    On August 3, 2022, defendant, who was out on bond, answered ready and demanded trial. The case was continued on the State's motion until September 7, 2022. At the following court date, the prosecutor informed the trial court that a witness was having surgery and would be unavailable for approximately two months. The court acknowledged defendant's previous demand for trial and set the case for trial on November 2, 2022.

¶ 6    On November 2, 2022, defendant failed to appear in court. His attorney advised the court that she had tried calling defendant, but his phone was previously out of service and she was contacting him through a friend. She left voicemails and text messages but had not heard

---

[1] The ticket for operating a motor vehicle without insurance was later nol prossed.

anything in response. The State answered ready for trial with its witnesses present. The State requested a warrant for the next date. The court observed that defendant had previously never missed a court date and entered and continued the State's request for a warrant. The case was then continued to November 16, 2022, for defendant to appear. The record indicates defendant appeared on that date.

¶ 7    On December 7, 2022, defendant was present in court for trial. The State was not present and defense counsel informed the court that the State let her know that it was not available for trial that day. The case was then continued for trial to January 4, 2023. The trial court also noted on the record that "defendant demands trial."

¶ 8    On January 4, 2023, the State informed the court that one of its witnesses, Officer Ronald Pedecone, was unavailable because he had been called to serve a search warrant with the Department of Homeland Security. The State asked the court to commence the trial so it could call the witnesses who were present and then continue the trial to a later date. Defense counsel asked the court to continue defendant's request for a trial demand, pointing out that the trial would not finish that day. The trial judge noted defendant's request. Later that day, the court accepted defendant's jury waiver and admonished him regarding those rights. The parties gave opening statements and the State presented the testimony of two witnesses.

¶ 9    Alejandro Sanchez testified he worked as security at a local bar called the Perception Lounge in Berwyn, Illinois. While at work at around 2 a.m. on February 13, 2022, Sanchez saw a dark SUV turn right onto train tracks near Grove Avenue in Berwyn. He ran toward the tracks and called 911 because he was concerned that a train might be approaching the oncoming SUV. He reported what he saw to the 911 operator, including a brief description of the vehicle. When he was 6 to 10 feet from the vehicle, Sanchez saw the car being driven in reverse and "striking

one of the poles that holds the arms for the tracks." After striking the pole, the vehicle drove forward and off of the tracks going northbound on Grove Avenue. The car then came back southbound on Grove Avenue, made a left turn on Windsor Avenue, then made another left onto Oak Park Avenue, and drove over some construction horses. The tracks on Oak Park Avenue were closed due to construction. The car then made an "immediate left" onto Stanley Avenue where it stopped.

¶ 10    Later, Sanchez was brought to the scene for a vehicle identification, and he confirmed it was the same vehicle he had seen earlier. He never saw the driver and no description was given to the police.

¶ 11    Berwyn police officer Evangelos Ladas, following the 911 call, reported to the 6800 block of Windsor Avenue in Berwyn, at around 2 a.m. on February 13, 2022. Once there, he spoke with the reporting party, Sanchez. Sanchez told the officer that he saw a gray SUV drive eastbound on the train tracks, then reverse, and then strike the railroad crossing arm. Officer Ladas and Sanchez then walked to the accident scene and the officer observed the vehicle parked around the railroad crossing. Officer Ladas identified photographs showing the damage to the railroad crossing arm as well as vehicle debris on the ground. Another officer, who Officer Ladas did not name, arrived at the scene and told Officer Ladas that he had performed a traffic stop on the suspected vehicle. Officer Ladas asked Sanchez if he could identify the vehicle. Sanchez identified the parked vehicle as the one he had observed drive onto the train tracks and strike the railroad crossing arm.

¶ 12    Following these witnesses, the trial was continued to February 1, 2023. On that date, the case was continued to February 22, 2023, when the trial resumed.

¶ 13     Berwyn police officer Nicholas Ulloa was on duty as an auxiliary officer with his partner Officer Eric Gonzalez on February 13, 2022, when he was waved down by a security guard at the Perception Lounge concerning a reckless driver. The security guard pointed to a vehicle and the officer observed the vehicle drive through a construction zone "hitting numerous barricades." This was a different incident than the striking of the railroad crossing arm, which Officer Ulloa did not witness. Officer Ulloa described the vehicle as a gray "most likely a hybrid of a sedan or SUV of some sort." The officer followed the vehicle for a few blocks, never losing sight of it, until the vehicle stopped at the intersection of Stanley and Home. Officer Ulloa waited for more units to arrive and activated his emergency lights. As an auxiliary officer, he was not authorized to make an arrest or initiate a traffic stop unless there was an emergency present. Other officers arrived at the scene soon afterward.

¶ 14     While Officer Ulloa and his partner were waiting for Berwyn officers to arrive, Ulloa observed the driver step out of the driver's side of the stopped car and approach the officers. The officers told the man "to stop and stay on the driver's side of the vehicle." Officer Ulloa described the driver as a black man, at least 6 feet tall with a thin build and dreadlocks. He identified defendant in court as the man he saw exit the stopped car from the driver's side. Officer Ulloa testified that defendant was the sole occupant of the stopped vehicle.

¶ 15     Officer Eric Gonzalez, also a Berwyn auxiliary police officer, was on patrol with Officer Ulloa on February 13, 2022. Officer Gonzalez's testimony was consistent with Officer Ulloa's description of their encounter with the vehicle driving through a construction zone. Officer Gonzalez also stated that he never lost sight of this vehicle and identified defendant in court as the man he observed exit the vehicle from the driver's side. He did not see anyone else at the scene, nor was he aware that anyone else was in the vehicle that evening.

¶ 16    Berwyn police K-9 officer Ronald Pedecone responded to a radio call near the area of Oak Park, Stanley, and Windsor in Berwyn regarding a hit and run and reckless driver. He heard the auxiliary officers call over the radio that they were behind the vehicle, and the vehicle "eventually stopped near Stanley and Home Avenue." Officer Pedecone proceeded to that location. There, he observed the auxiliary officers standing outside the front driver's side door with a man he later learned was defendant. He identified defendant in court. Officer Pedecone also testified no one else was present in the vehicle at that time.

¶ 17    Officer Pedecone observed the subject vehicle and saw damage, including a crack to the front bumper on the passenger's side, as well as a broken rear passenger side taillight and part of the trunk was cracked. Officer Pedecone learned that defendant's driver's license was suspended at the time of the incident. He also learned that the vehicle was registered to defendant. The car was inventoried and during a search, Officer Pedecone found an open bottle of Hennessy on the front passenger's seat. The officer also reported a "strong odor of cannabis in the car." Based on that observation, he "deployed" his canine partner inside the vehicle. The canine alerted to a black bag on the floorboard of the front passenger's side. A search of the bag revealed multiple individual packaged small bags containing suspect cannabis. Officer Pedecone later inventoried these bags as well as a digital scale. On the inventory form, he left the section for lab instructions blank, and he did not send the suspected cannabis for testing. As far as the officer knew, the bags were not sent to a lab for testing. Officer Pedecone stated that he had extensive training in being around cannabis and recognized the items as cannabis based on his own observations. The officer also testified that "it was based off of the dog's alert. She's trained to alert to cannabis, cocaine, methamphetamine and heroin." The officer testified that cannabis "needs to be stored in a childproof odorless container per the statute." Officer Pedecone subsequently prepared the

report and issued the tickets against defendant. He was unsure if he recovered the keys to the vehicle or if another officer had done so. He did not document the keys because he did not "find it particularly relevant." The officer would have documented in the report if the keys were missing, but that did not occur here.

¶ 18    The State rested its case after it offered a certified abstract of defendant's driving record showing that a statutory summary suspension was in effect against defendant on February 13, 2022.

¶ 19    Samantha Myers-Dineen, a law clerk for the public defender's office, testified about a conversation she had with Officer Gonzalez earlier that day. According to Myers-Dineen, Officer Gonzalez told her he did not pull the vehicle over. The officer said he had been flagged by a security officer at a lounge, and he was sitting outside the lounge talking to the security officer when he saw the vehicle cross the construction site  and stop. He told her it took about five minutes to get from the lounge to the stopped vehicle. He could not see what was happening in the vehicle while he was talking to the security officer. Myers-Dineen also spoke with Officer Ulloa the morning of the trial and he said he pulled over the vehicle.

¶ 20    Following this testimony, the defense moved for a directed finding, which the trial court denied.

¶ 21    Pamela Lester testified that she was defendant's cousin. Around 3 a.m. on February 13, 2022, she received a phone call from her now deceased uncle asking her to come and drive defendant's car. Lester's uncle told her that he was driving the car when something happened. The uncle needed her to drive the car because his license was not valid. He also told her to "call and see what was going on" because the police were at the vehicle. Lester located defendant at the Berwyn police station where she picked him up. Lester denied being contacted by the police

or by defendant about where defendant had been taken. She was not "allowed" to tell the police that defendant had not been driving and the police "wouldn't even tell [her] what he was arrested for." She never went to the scene and did not drive the vehicle. Lester did not tell anyone about the conversation she had with her uncle that night until the day of trial. Her uncle also told her he "walked off" and went to a local bar. She concluded her testimony by adding that her uncle passed away in November 2022.

¶ 22    Defendant testified that at approximately 2 a.m. on February 13, 2022, he was in the passenger seat of his car while his uncle was driving. Defendant was asleep when his uncle drove through the barricades and hit the railroad crossing. Defendant was sleeping when all of this occurred because he was intoxicated. When his uncle woke him up, defendant saw glass falling from the back window of his car. He had an argument with his uncle outside of the car. According to defendant, his uncle took the car keys and walked away, past the police. Defendant was standing outside the driver's side of the car when the police arrived.

¶ 23    After the police arrived, defendant tried to tell them he was not driving that night, but they were not listening to him, so he asked to speak to a sergeant. He denied calling Lester to pick him up and said only his uncle had her contact information. He denied ever sitting in the driver's seat and he never exited the car from the driver's side that night.

¶ 24    Following arguments, the trial court found defendant guilty of all charges. The court specifically found the State's witnesses and all of the officers "were credible and not impeached." The court further found the defense witnesses, including defendant, and their testimony to be "incredible and not believable" and "self-serving." The court made the following findings.

        "Today we're told about an uncle. We were given no evidence of who this

uncle is, no name, no death certificate, and no evidence that he had a driver's license or that it was ever suspended.

Defendant testifies that he was upset at the uncle for damaging his car, which leads the Court to believe that there was some type of collision that took place. Otherwise, why would the defendant be upset if his uncle was driving the car and caused damage to it?

There are no phone records presented. The defendant was uncooperative, and supposedly asleep throughout the entire scenario. There was no other evidence presented by the defense to corroborate its argument.

***

Actually, we've gone a long time in this case, but it's not fathomable or believable that another driver was in this car and not detected, and no one ever knew about it. It's incredible.

It's an incredible story that the defendant would allow someone else who had his license revoked to drive his car, he's sleeping in the back and not know anything about what happened.

Yes, early on the driver of the vehicle was not identified by the security guard or the police or anybody. But, when the defendant walked out of that vehicle, it's clear that he was the driver of that vehicle and came out from it when there was no one else in the vehicle at all."

¶ 25    Defendant filed a motion asking the court to reconsider its finding of guilt, or in the alternative, for a new trial, which the trial court denied. Following a hearing, the trial court sentenced defendant to 12 months of supervision and 240 hours of community service.

¶ 26    This appeal followed.

¶ 27    Defendant first argues that his trial counsel was ineffective for failing to file a motion to dismiss the charges against him because he was tried more than 160 days after he made his demand for trial. According to defendant, 169 days attributable to the State passed between his trial demand (August 3, 2022) and when his trial occurred (February 22, 2023). The State responds that defendant's speedy trial rights were not violated because his trial commenced within the statutory 160-day term. The State continues, contending that because no violation occurred, defense counsel had no obligation to file a meritless motion and defendant's ineffective assistance claim fails.

¶ 28    We begin by setting forth the framework for a claim of ineffective assistance of counsel. Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). A defendant must satisfy both prongs of the *Strickland* test and the failure to establish either is fatal to the claim. *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S.

at 697). "Counsel's failure to assert a speedy-trial violation cannot establish either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy-trial objection." *People v. Phipps*, 238 Ill. 2d 54, 65 (2010). Therefore, we first determine whether defendant's right to a speedy trial was violated. *Id.*

¶ 29    A defendant has both a constitutional and a statutory right to a speedy trial. *Id.* (citing U.S. Const., amends. VI, XIV, Ill. Const. 1970, art. I, § 8, 725 ILCS 5/103-5 *et seq.* (West 2004)). The speedy trial statute incorporates a defendant's constitutional right to a speedy trial. *People v. Cordell*, 223 Ill. 2d 380, 385-86 (2006).

¶ 30    Section 103-5(b) provides, in relevant part:

> "Every person on bail or recognizance shall be tried by the court
> having jurisdiction within 160 days from the date defendant
> demands trial unless delay is occasioned by the defendant ***. The
> defendant's failure to appear for any court date set by the court
> operates to waive the defendant's demand for trial made under this
> subsection." 725 ILCS 5/103-5(b) (West 2022).

¶ 31    Any delay occasioned by a defendant temporarily tolls the speedy-trial term. See *id.* § 103-5(f). A defendant occasions a delay when he requests a continuance, agrees to a continuance, or his actions otherwise cause or contribute to a delay. *People v. Sundell*, 2025 IL App (2d) 240490, ¶ 44.  If the defendant is not tried within this 160-day period, the defendant "shall be discharged from custody or released from the obligations of his bail or recognizance." 725 ILCS 5/103-5(d) (West 2022); see *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006).

¶ 32    It is undisputed that defendant made his first trial demand on August 3, 2022, and his

speedy trial term began. According to defendant, his trial commenced more than 160 days later on February 22, 2023. However, on January 4, 2023, the State requested that the trial be "commence[d] and continue[d]" because Officer Pedecone, who was present in court that morning, had been called away to conduct a search warrant with the Department of Homeland Security. The prosecutor noted that the State's two other witnesses were present and ready to testify. The trial court agreed to commence the trial. Defendant executed a jury waiver, the court admonished defendant, the parties made opening statements, and the State presented the testimony of two witnesses, Sanchez and Officer Ladas. The trial was continued to a later date and was resumed on February 22. Defendant asks this court to find that the trial did not commence on January 4 because the State "was not actually ready" for trial that day and his trial did not conclude until 49 days later.

¶ 33    Illinois courts have long held that the speedy trial statute is satisfied when the trial begins. See *People v. Williams*, 59 Ill. 2d 402, 405 (1974) (finding the speedy trial statute "was satisfied by beginning the process of selecting the jury for the trial of the case" on day 119 of the term.) "The speedy-trial statute provides that a defendant 'shall be tried' within a certain period of time." *People v. Cosenza*, 215 Ill. 2d 308, 315 (2005) (citing 725 ILCS 5/103-5 (West 2002)). However, the supreme court "has never construed the 'shall be tried' language as requiring that a criminal trial must be 'concluded' within the time period specified." *Id.* (citing *Williams*, 59 Ill. 2d at 405).

¶ 34    According to defendant, the trial was delayed because the State was "not actually ready" because Officer Pedecone was unavailable. Defendant relies on *People v. Roberson*, 289 Ill. App. 3d 344, 349-50 (1997), and *People v. Perkins*, 90 Ill. App. 3d 975, 977-78 (1980). However, the facts in those two decisions are readily distinguishable from the facts in this case.

In both cases, the initial jury selection began within the applicable speedy trial term, but the venire was later dismissed and another jury was selected for the trial after the expiration of the term. See *Roberson*, 289 Ill. App. 3d at 349-50 (the jury was selected but not sworn and later dismissed when the prosecutor's illness delayed trial); *Perkins*, 90 Ill. App. 3d at 977-78 (the trial court dismissed the entire venire when it was determined that their continued service would be inconvenient).

¶ 35    Defendant's assertion that the trial did not commence until February 22, 2023, is also rebutted by the record. By his own admission, January 4, 2023, was day 120 of his speedy trial term. The trial unquestionably began on January 4, 2023, with defendant's jury waiver, opening statements and witness testimony. Since defendant's trial began within 160-days of defendant's trial demand, the speedy trial statute was satisfied and no speedy trial violation occurred in this case.

¶ 36    However, even if we were to conclude defendant's trial did not begin on January 4, 2023, his speedy trial claim is still without merit because he waived his initial demand when he failed to appear on November 2, 2022. Defendant concedes that he did not appear on that date but asserts that his "brief absence" was not a failure to appear and did not waive his prior trial demand and reset his speedy trial clock.

¶ 37    Section 103-5(b) explicitly provides: "The defendant's failure to appear for any court date set by the court operates to waive the defendant's demand for trial made under this subsection." 725 ILCS 5/103-5(b) (West 2022). Thus, the question is whether defendant's absence on November 2, 2022, constituted a "failure to appear" under this statute and waived his trial demand.

¶ 38    Defendant's case was set for a bench trial on November 2, 2022. When the case was

13

called, defense counsel informed the court that she had tried to call defendant. Defendant's phone was previously out of service and counsel was contacting defendant through a friend. Counsel stated that she left voicemails and sent text messages but did not receive a response. The State answered ready for trial with all witnesses present and requested a warrant for the next date. The trial judge noted that defendant had not missed a court date before and allowed one date to notify defendant. The judge entered and continued the State's request for a warrant to November 16, 2022. The record indicates that defendant appeared on that date.

¶ 39 Illinois courts have consistently held that a defendant's failure to appear on any set court date waives his demand for trial under the speedy trial statute. See *People v. Zakarauskas*, 398 Ill. App. 3d 451, 454 (2010) (the reviewing court concluded that the plain language of section 103-5(b) expressed the legislature's intent that a defendant's failure to appear waived, *i.e.*, relinquished, his previous trial demand); *People v. Patterson*, 392 Ill. App. 3d 461, 467 (2009) (finding the defendant waived his speedy trial demand when he failed to appear on the scheduled trial date); *People v. Minor*, 2011 IL App (1st) 101097, ¶¶ 16-17 (holding that the defendant's failure to appear operated to waive her previously filed speedy trial demand, and a new speedy trial term began upon the filing of her second demand); *People v. Galloway*, 2014 IL App (1st) 123004, ¶ 32 (finding that the defendant's failure to appear at the date and time set for trial waived her speedy trial demand).

¶ 40 Defendant attempts to distinguish his failure to appear as merely a delay that tolled the speedy trial clock. According to defendant, his absence did not waive his prior demand because a bond forfeiture warrant was not issued for a failure to appear. To determine whether defendant's failure to appear waived his trial demand, we consider the specific language of section 103-5(b). "The cardinal rule of statutory construction is to ascertain and give effect to the legislature's

intent." *People v. Comage*, 241 Ill. 2d 139, 144 (2011). "The legislature's intent is best indicated by giving the statutory language its plain and ordinary meaning." *Id.*

¶ 41    Based upon the plain, unambiguous language of section 103-5(b), which provides the "failure to appear for *any* court date," we conclude defendant waived his speedy trial demand when he failed to appear on November 2, 2022. (Emphasis added.) 725 ILCS 5/103-5(b) (West 2022). Nothing in the statutory language requires the issuance of a bond forfeiture warrant to trigger a waiver of the trial demand. The plain language simply provides for a waiver of a speedy trial demand when a defendant fails to appear, which occurred in this case on November 2, 2022. Contrary to defendant's argument, the speedy trial term was not tolled. A new term began when defendant next demanded trial on December 7, 2022. Accordingly, defendant's right to speedy trial was not violated.

¶ 42    Defendant's reliance on *People v. Kohler*, 2012 IL App (2d) 100513, is misplaced because the facts there are easily distinguishable from this case. In that case, the defendant argued on appeal that he was not brought to trial within the statutory 160-day period. *Id.* ¶ 15. The Second District reviewed the record and determined that the defendant's trial occurred more than 50 days after the expiration of his speedy trial term. *Id.* ¶ 20. The State argued that the defendant waived his term by failing to appear when the case had been set for trial on April 7, 2009. *Id.* ¶ 34. On that date, defense counsel explained the defendant's absence and informed the trial court that the defendant had contacted her to tell her he was ill and could not make it to court that day. Counsel then contacted the prosecutor to inform him about the defendant's illness. Counsel then moved for a continuance with no objection from the prosecutor, which the court granted. *Id.* ¶ 35.

¶ 43    The reviewing court distinguished the defendant's absence from a failure to appear and

found that this absence "did not run afoul of the failure-to-appear waiver provision" in section 103-5(b). *Id.* ¶ 36. The *Kohler* court concluded the defendant did not fail to appear, but rather, his absence and the grant of a motion to continue the matter was one of the types of delay that would not constitute a waiver under section 103-5(b). *Id.* ¶ 38 (citing *Zakarauskas*, 398 Ill. App. 3d at 454). The key takeaway from *Kohler* is that when a defendant informs his or her counsel *prior* to the scheduled hearing to explain their inability to be present, such as due to illness, allowing both opposing counsel and the court to be notified, those circumstances do not constitute a "failure to appear." See *id.* Those are simply not the circumstances present here.

¶ 44     We find the analysis in *People v. Higgenbotham*, 2012 IL App (1st) 110434, relevant. In that case, the defendant was not present in court for trial, but defense counsel informed the trial court that the defendant had been admitted to the hospital and provided a doctor's note confirming her admission. *Id.* ¶ 5. The case was continued for three weeks, but the defendant failed to appear on the next two court dates. Defense counsel informed the court on both dates that she had been unable to reach the defendant or her family and she did not know the defendant's whereabouts. *Id.* ¶ 6. The State moved for a bond forfeiture warrant, which the court entered and continued to the next court date. The defendant appeared at the next court date and presented a doctor's note indicating that she had been hospitalized when she missed the previous two court dates. *Id.* ¶ 7. The defendant later moved to dismiss her case based on a violation of her speedy trial rights, which the trial court granted. *Id.* ¶¶ 7-11.

¶ 45     On appeal, the State argued that the defendant waived her speedy trial rights when she failed to appear for three consecutive court dates. The defendant responded that she did not waive her rights when she offered a valid reason for missing those court dates. *Id.* ¶¶ 14-15. The reviewing court discussed both *Zakarauskas* and *Minor* in its analysis before turning to the

16

circumstances of the defendant's absences. While the State contended that the defendant waived her speedy trial demand on her first missed court date, the *Higgenbotham* court disagreed. The court acknowledged that although the defendant was not physically present, defense counsel appeared on her behalf and informed the trial court of the defendant's health problems, including a doctor's note, and requested a continuance, which was granted without objection. *Id.* ¶ 24. Relying on *Kohler*, the reviewing court found the defendant's first absence was an absence contemplated in *Zakarauskas* as not resulting in a waiver of a speedy trial term. *Id.* (quoting *Kohler,* 2012 IL App (2d) 100513, ¶ 38).

¶ 46    However, turning to the next two failures to appear, the *Higgenbotham* court observed that unlike the first absence, defense counsel was not informed of the defendant's whereabouts and was unable to communicate with her. *Id.* ¶ 25. While the defendant later explained the reason for her missed appearances, the reviewing court, though sympathetic, found that "pursuant to the plain language of the speedy trial statute as well as our decisions in *Zakarauskas* and *Minor,* when a defendant fails to appear in court for any reason, regardless of whether he or she provides an explanation for her absence at a subsequent court date, the defendant waives his or her demand for a speedy trial." *Id.* ¶ 26 (citing 725 ILCS 5/103-5(b) (West 2008); *Minor,* 2011 IL App (1st) 101097, ¶ 17; *Zakarauskas,* 398 Ill. App. 3d at 454). Significantly, "a defendant cannot transform a 'failure to appear' pursuant to subsection (b) of the speedy trial statute into a 'delay occasioned by defendant' outlined in subsection (f) and avoid the effects of waiver, simply by providing an explanation for her absence at a later court date." *Id.* Accordingly, the court held that the defendant waived her speedy trial demand when she failed to appear at the second missed court date. *Id.* ¶ 27.

"Just as the speedy trial statute does not provide an exception for explained

absences, the statute also makes no mention of unavoidable absences. ' "We will not rewrite a statute under the guise of statutory construction or depart from a statute's plain language by reading into it conditions, exceptions, or limitations not expressed by the legislature." ' " *Id.* ¶ 28 (quoting *Minor*, 2011 IL App (1st) 101097, ¶ 17, quoting *In re M.A.*, 356 Ill. App. 3d 733, 737 (2005)).

¶ 47     In the present case, defendant seeks to read an exception into the statute's plain language, *i.e.*, a failure to appear does not waive the speedy trial term unless a bond forfeiture warrant has been issued. No such exception is included in the plain language of section 103-5(b), and as in *Higgenbotham* and *Minor*, we decline to add such an exception here. As *Higgenbotham* makes clear and contrary to defendant's assertion, the holding in *Kohler* did not turn on whether a bond forfeiture warrant had been issued, but whether the defendant provided advance notice to defense counsel and by extension the court and the State of a valid reason the defendant could not appear. See *id.* ¶ 27; *Kohler*, 2012 IL App (2d) 100513, ¶¶ 36-37. This holding is inapplicable here because defendant did not notify his attorney in advance with a good cause excuse that he could not appear for trial on November 2, 2022. Instead, defense counsel informed the court that she had been unable to contact defendant. Nor has defendant ever offered any reason as to why he failed to appear for trial. Accordingly, we conclude that defendant's failure to appear on November 2, 2022, waived his speedy trial demand pursuant to section 103-5(b). A new speedy trial term began on December 7, 2022, when defendant made his next trial demand and, thus, his trial was conducted well within that new term.

¶ 48     Since no speedy trial violation occurred, defendant cannot satisfy either prong under *Strickland* that his trial counsel was ineffective for failing to move to dismiss on this basis. See *Phipps*, 238 Ill. 2d at 65 ("Counsel's failure to assert a speedy-trial violation cannot establish

either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy-trial objection."). Thus, defendant's claim of ineffective assistance fails.

¶ 49     Defendant next contends the State failed to prove him guilty beyond a reasonable doubt of the possession of adult use cannabis by a driver. Specifically, defendant asserts that there was insufficient evidence to establish his guilt because: (1) the substance alleged to be cannabis was never tested; (2) the substance was found in a woman's purse in a shared vehicle and no evidence was presented that defendant knew the substance was in the vehicle; and (3) there was no evidence to show the substance was in a noncompliant container or that defendant knew the container was noncompliant. The State responds that there was sufficient evidence for a reasonable trier of fact to find that defendant knowingly possessed cannabis in a noncompliant container.

¶ 50     "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Accordingly, the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Brown*, 2013 IL 114196, ¶ 48. While these findings by the trier of fact are entitled to deference, they are not conclusive. A court of review will reverse a criminal conviction when the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id*. This standard of review is applied

regardless of whether the defendant opted for a bench or jury trial. *Id*.

¶ 51    Here, defendant was charged with a class A misdemeanor for the possession of adult use cannabis in a motor vehicle. Specifically, section 11-502.15(b) of the Illinois Vehicle Code provides: "No driver may possess cannabis within any area of any motor vehicle upon a highway in this State except in a secured, sealed or resealable, odor-proof, child-resistant cannabis container that is inaccessible." 625 ILCS 5/11-502.15(b) (West 2022).

¶ 52    Defendant first asserts that the State failed to prove the substance found in the vehicle was cannabis because the substance was never tested to determine if it was cannabis. Defendant argues that absent sufficient proof beyond a reasonable doubt of the identity of the substance, his conviction must be reversed. The State asserts the circumstantial evidence from Officer Pedecone and the canine's alert was sufficient to prove beyond a reasonable doubt that the recovered substance was cannabis.

¶ 53    The right to due process under the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) protects an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary that constitutes the crime charged. *People v. Murray*, 2019 IL 123289, ¶ 28. "An essential element of proof to sustain a conviction cannot be inferred but must be established." *Id*. It is the State's burden to prove each element of an offense beyond a reasonable doubt. *Id*. "In a controlled substance case, the State must present sufficient evidence that the substance at issue is a controlled substance." *People v. Hagberg*, 192 Ill. 2d 29, 34 (2000) (citing *People v. Park*, 72 Ill. 2d 203, 211 (1978)). Here, the State was required to prove the substance recovered from the vehicle was cannabis.

¶ 54    At trial, Officer Pedecone testified that during his inventory search of the vehicle, "there was a strong odor of cannabis" and he then "deployed" his canine partner. The canine alerted to a

black bag on the front passenger floorboard. When the officer searched the bag, he found multiple individual packaged plastic bags "containing cannabis." These bags were recovered and entered into evidence. On the inventory form, Officer Pedecone left the section for lab instructions blank. He did not send the property to a lab and as far as he knew it was never tested at a lab. Although he was not qualified as an expert in the identification of cannabis, Officer Pedecone stated that he had extensive training in being around cannabis and recognized the items as cannabis based on his own observations. Additionally, he testified "it was based off of the dog's alert. She's trained to alert to cannabis, cocaine, methamphetamine and heroin."

¶ 55    Relying on *Park*, defendant argues that Officer Pedecone's testimony that he recovered cannabis was insufficient to establish that the substance recovered was, in fact, cannabis. In *Park*, the defendant admitted that he was in possession of marijuana recovered after officers conducted an investigatory stop pursuant to a tip. *Park*, 72 Ill. 2d at 206. The only direct evidence that the recovered substance contained marijuana came from a deputy sheriff who testified as an expert that he could identify marijuana by " 'feel, smell, texture and looks.' " *Id*. at 207. The supreme court held this testimony inadmissible, finding the officer's limited experience and lack of training in identifying marijuana did not qualify him to state an opinion on the identification of the substance received from the defendant. *Id*. at 210-11.

¶ 56    The *Park* court acknowledged that "circumstantial evidence can be used to establish that a substance contains cannabis," but found that the circumstantial evidence presented in that case was insufficient. *Id*. at 212. The supreme court observed it was the State's burden "to prove the actual identity of the substance in question beyond a reasonable doubt." *Id*. at 211-12. The court further found the defendant's admission that the substance was cannabis was insufficient, noting "its probative value or weight is limited, in the absence of substantial evidence that this 17-year-

21

old defendant had some means of knowing that the substance in question contained cannabis." *Id*. at 212. "In short, the State would have us cure its lack of diligence in preparing its case by overlooking the substantial possibility that, on the basis of the evidence presented, the substance in question was not cannabis. This we cannot do." *Id*. at 213.

¶ 57    Although the supreme court has also held that chemical testing is not necessary to establish that a recovered substance was a controlled substance (*People v. Robinson*, 14 Ill. 2d 325, 330-31 (1958)), the *Park* court found "police officers may not be presumed to possess the requisite expertise to identify a narcotic substance." *Park*, 72 Ill. 2d at 211. The supreme court in *Park* reasoned that "[t]o determine accurately that a particular substance contains cannabis, all that is necessary is microscopic examination combined with the Duquenois-Levine test." *Park*, 72 Ill. 2d at 213-14. The court explained that this "highly reliable" test "requires only readily available prepackaged materials and is easy to perform" by dissolving the substance in a chemical and a color change would indicate a positive result. *Id*. at 214. The supreme court has subsequently observed the prosecution cannot prove a substance is marijuana simply by introducing the substance and asking the trier of fact to apply its reason and experience. *People v. Phillips*, 215 Ill. 2d 554, 572 (2005) (citing *Park*, 72 Ill. 2d at 209-11).

¶ 58    Here, no testing was performed to identify the recovered substance. Further, Officer Pedecone was not qualified as an expert in the identification of cannabis. As the *Park* court observed, identifying cannabis by feel, smell, sight, and touch is "highly prone to error in the hands of anyone but an expert." *Id*. at 208. No direct evidence was presented to establish that the recovered substance was cannabis. When asked by the prosecutor how he knew the substance was "allegedly cannabis," Officer Pedecone responded, "I have extensive training in being around cannabis. So my own observations. But it was based off of the dog's alert. [The dog is]

trained to alert to cannabis, cocaine, methamphetamine and heroin." While the smell of cannabis

and a canine's alert may be sufficient to support probable cause (See *People v. Mallery*, 2023 IL

App (4th) 220528, ¶ 49 (finding a canine alert sufficient to show probable cause); *People v.*

*Molina*, 2022 IL App (4th) 220152, ¶ 52 (holding the smell of raw cannabis can establish

probable cause)), this evidence was not sufficient to establish proof beyond a reasonable doubt.

The absence of expert testimony or any laboratory testing of the substance failed to prove the

presence of cannabis beyond a reasonable doubt.

¶ 59    As in *Park*, we conclude that after viewing the evidence in the light most favorable to the

prosecution, the State failed to sufficiently establish that the substance recovered from

defendant's vehicle was cannabis. We therefore reverse defendant's conviction for possession of

adult use cannabis in a motor vehicle. Since we have reversed defendant's conviction on this

basis, we need not address his other argument to support reversal of this charge.

¶ 60    Finally, defendant argues that his remaining convictions should be reversed because the

State failed to prove beyond a reasonable doubt that he was the driver of the vehicle. The State

maintains that the evidence was sufficient to establish he was the driver of the vehicle because

multiple witnesses testified to seeing defendant exit the car from the driver's side door and no

credible evidence was present that another individual was present in the vehicle.

¶ 61    As we previously observed, when reviewing the sufficiency of the evidence, a reviewing

court, viewing the evidence in the light most favorable to the prosecution, must decide whether

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. *Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson*, 443 U.S. at 319). We afford

great deference to the trial court's findings on witness credibility, the weight to be given certain

testimony, the balancing of conflicting evidence, and the reasonable inferences to be drawn from

the evidence. *Wright*, 2017 IL 119561, ¶ 70. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 62    The remaining offenses were unsafe backing on a roadway (625 ILCS 5/11-1402 (West 2022)); failure to notify of damage caused by a motor vehicle crash (625 ILCS 5/11-404 (West 2022)); transportation of alcohol by a driver (625 ILCS 5/11-502 (West 2022)); and driving on a suspended license (625 ILCS 5/6-303 (West 2022)). According to defendant, none of the witnesses observed who was driving the vehicle and there was no evidence that defendant had the keys, "which were never recovered." Defendant also asserts that no evidence contradicted the defense testimony that his uncle was the driver and left the scene with the keys before the police arrived.

¶ 63    The evidence presented at trial sufficiently established that defendant was the driver of the vehicle. Officers Ulloa and Gonzalez both testified that they followed the vehicle and defendant was the sole occupant. Specifically, Officer Ulloa recounted that while the officers followed the vehicle for a few blocks, he never lost sight of the vehicle. After the vehicle stopped at a stop sign, the officer activated his emergency lights. While Officers Ulloa and Gonzalez remained in their vehicle, Officer Ulloa observed the driver step out of the driver's side of the stopped car and approach in the officers' direction. The officers told the man "to stop and stay on the driver's side of the vehicle." Officer Ulloa described the driver as a black man, at least 6 feet tall with a thin build and dreadlocks and identified defendant in court as the man he saw exit the

stopped car from the driver's side. Officer Ulloa testified that no one else was present at the scene other than the officers and defendant. Similarly, Officer Gonzalez testified that he never lost sight of this vehicle and identified defendant in court as the man he observed exit the vehicle from the driver's side. He did not see anyone else at the scene, nor was he aware of anyone else in the vehicle.

¶ 64     Further, Officer Pedecone testified that defendant was the only person standing by the vehicle when the officer arrived at the scene. He stated that the vehicle was registered to defendant. None of the other State witnesses recounted seeing anyone else at the scene or walking away from the vehicle. The court further found that the State's witnesses testified credibly and were not impeached.

¶ 65     In contrast, defendant and his cousin testified that their now-deceased uncle had been in the car with defendant. According to defendant, the uncle was driving but fled the scene on foot with the keys while walking past the police officers. Neither witness provided the name of this uncle or any identifying information. The trial court specifically found that the defense witnesses' testimony was "incredible and not believable" and "self-serving." The court also noted there was "no evidence of who this uncle is, no name, no death certificate, and no evidence that he had a driver's license or that it was ever suspended." The court also pointed out it was an "incredible story" where defendant allowed his uncle, who also had a suspended license, to drive defendant's car while defendant slept through the "entire scenario" when the car drove onto the railroad tracks and struck the railroad crossing arm. The court found the defense theory "that another driver was in this car and not detected, and no one ever knew about it" was simply unworthy of belief.

¶ 66     Defendant seeks to minimize the testimony from Officers Ulloa and Gonzalez as inconsistent. He contends that Officer Ulloa's testimony that they followed the car for 8 to 10 blocks was not credible when the traffic stop was three blocks from where the vehicle was first seen by Sanchez. However, Officer Ulloa testified that they followed the vehicle for what "could have been a few minutes, a few blocks" before the vehicle stopped. When asked by defense counsel if they followed the vehicle "for about eight or ten blocks," the officer answered, "A few minutes, yes." The officers did not detail the path the vehicle took while they followed it. These alleged inconsistencies do not render the officers' testimony unworthy of belief. Defendant's assertion that he was asleep at that time does not contradict the officers' testimony. Further, and significantly, none of this testimony changes the fact that no other individual was observed at or near the scene. None of the officers or Sanchez saw a man walking away from the vehicle at the time of the accident. Nor does this argument contradict the officers' testimony that they followed the vehicle without losing sight for multiple blocks before it stopped and defendant was the only person seen exiting the vehicle from the driver's side. No other occupant was present.

¶ 67     We further reject defendant's suggestion that the vehicle's keys were never recovered and no one saw the car running or the keys in the ignition. This is clearly belied by the record. As stated directly above, Officers Ulloa and Gonzalez explicitly testified that they followed the car while in motion until it came to a stop. Additionally, Officer Pedecone did not testify that the keys were never recovered, he only said that he did not recall if he or another officer recovered the keys. He stated that he did not document the keys because he did not "find it particularly relevant," but he would have documented that fact if the keys were missing. Again, the lack of documentation about the recovery of the keys does not refute the testimony that defendant was

seen exiting the driver's side of the vehicle. All of the officers consistently testified that defendant was the only occupant of the vehicle.

¶ 68     Viewing the evidence in the light most favorable to the State, a rational trier of fact could have concluded that defendant was the driver of the vehicle. The trial judge specifically found "when the defendant walked out of that vehicle, it's clear that he was the driver of that vehicle and came out from it when there was no one else in the vehicle at all." Accordingly, defendant's claim on the remaining four traffic offenses fails.

¶ 69     Based upon all of the above, we reverse defendant's conviction for possession of adult use cannabis in a motor vehicle and affirm the convictions on the other offenses.

¶ 70     Affirmed in part, reversed in part.