NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241515-U

NO. 4-24-1515

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Whiteside County |
| STEVEN W. COLEMAN, | ) | No. 20CF144 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Patricia A. Senneff, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Lannerd and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The evidence was sufficient to support the jury's guilty verdict; (2) defendant failed to establish counsel was ineffective for failing to challenge the admission of expert testimony, cell phone records, and victim impact statements; and (3) defendant failed to establish that counsel was ineffective or that plain error applied for failing to object to the imposition of consecutive sentences.

¶ 2    Defendant Steven W. Coleman appeals his conviction on three counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 2020)), three counts of aggravated arson (*id.* § 20-1.1(a)(1)), and one count of residential arson (*id.* § 20-1(b)). Defendant was sentenced to three consecutive life sentences for the murders and terms of various years' imprisonment on the other charges, all to be served consecutively. Defendant argues his counsel provided ineffective assistance in the admission of certain evidence, the State failed to prove his guilt beyond a reasonable doubt, and trial counsel was ineffective for failing to raise certain errors in his sentencing, including imposing an aggregate sentence in violation of the statutory maximum

sentence in section 5-8-4(f)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-4(f)(2) (West 2024)).

¶ 3        We affirm.

¶ 4                                I. BACKGROUND

¶ 5        A fire occurred at the Western Apartments at 908 West 3rd Street in Sterling, Illinois, in the early morning hours of June 1, 2020, resulting in the deaths of three apartment complex residents, Carrie A. Hose and two minors, C.R.S. and S.R.W. Another apartment resident was injured in the fire, and a fireman was injured while fighting the blaze.

¶ 6                                A. Charges

¶ 7        Defendant was arrested and charged by information, and later by amended information with three counts of aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2020)) (counts I-III) (all Class X felonies), one count of residential arson (*id.* § 20-1(b)) (count IV), and six counts of first degree murder (*id.* § 9-1(a)(2)) (counts V-X) (all Class M felonies). According to the State, defendant deliberately set the fire in retaliation for a fraudulent drug sale.

¶ 8                                B. Trial

¶ 9        The case proceeded to trial in July 2024 over the course of several days. The relevant testimony is summarized below.

¶ 10                               1. *The Fire*

¶ 11        Alma Walker and her husband, residents of Apartment 4 on the upper level of the Western Apartments in Sterling, Illinois, awoke at approximately 12:30 a.m. on June 1, 2020; Alma detected extreme heat on the upper half of her body. Within a few minutes, she smelled what she described as the scent of burning shingles. The room was dark, but she quickly realized the apartment was on fire. Her husband called 911 and left through the window, and she went to look

for her children and niece in the neighboring rooms. She testified, "I was yelling for the kids. Telling them if you can hear me cover up with a blanket and try to come to the nearest window. I was like, I can't see nothing. I can't see you." According to Walker, "It just kept getting more and more dense until it was like blacker and blacker" and "it kept getting hotter." Walker said she was unable to locate the girls through the darkness and smoke and later jumped out of the window. She suffered significant injuries from the fire.

¶ 12        Fire department personnel were dispatched to the fire at approximately 12:30 a.m. and arrived roughly 15 minutes later. The parties stipulated that the autopsy report indicated the cause of death of the three fatalities was carbon monoxide intoxication due to an apartment fire. Firefighter George Markel was injured fighting the fire and a resident, Walker, suffered severe burns. The fire was extinguished around 4:30 a.m.

¶ 13        The Western Apartments complex had two buildings, one at 907 West 3rd Steet (north) and one at 908 West 3rd Street (south). Each building had a common entrance, which was the only entrance to the buildings. Most of the fire damage occurred to the lower level, although the second level sustained heavy damage. The foyer contained two stairways, one going up and one going down.

¶ 14                2. *Defendant's Activities Before and After the Fire*

¶ 15                        a. Carly Fishbach

¶ 16        Defendant's girlfriend at the time, Carly Fishbach, testified that she had gone to the Western Apartments building on the afternoon of May 31, 2020, specifically, the south building, to buy cocaine from a friend. She said she and defendant "used it" and later in the day wanted more. Fishbach said she made a call and purchased additional cocaine from another friend (the original dealer's girlfriend) using $150 that defendant had given her. The transaction occurred at

- 3 -

Fishbach's home. According to Fishbach, it turned out that what she purchased was not actually cocaine, which upset her and defendant. Fishbach said defendant was yelling and that he "wanted to go to the Westerns" to "light it up."

¶ 17      Fishbach testified that defendant contacted his mother and his brother Jesse Coleman, seeking a ride. According to Fishbach, defendant told Jesse that he needed a ride to the Western Apartments. Fishbach said a car arrived at her house and defendant departed in it. When he returned, defendant did not say where he had gone. He did, however, tell Fishbach that if anyone asked where he had been, she should say that "we were together."

¶ 18      According to Fishbach, defendant did not go to work the next day, though he did not appear sick. Fishbach said that she went to see the Sterling police after she discovered a red gas can was missing from her garage. She said defendant had a black and yellow iPhone and that she knew the passcode and gave it to the police.

¶ 19      On cross-examination, Fishbach acknowledged that she had been using cocaine off and on for a couple of years before the day in question. She also acknowledged that she drank "[a] lot" and that she had been drinking on that day. She said she was "really drunk." Fishbach admitted that she had sent a threatening text about the fake drugs to the person from whom she purchased them. She also said that she did not "dump" defendant's phone at the Western Apartments and did not set the fire.

¶ 20                          b. Jesse Coleman

¶ 21      Defendant's brother Jesse confirmed that he received a phone call from his brother late on May 31 asking for a ride. He testified that he picked defendant up at Fishbach's house and defendant had a red gasoline can with him when he entered the car. Coleman said defendant wanted to go to the Western Apartments. Jesse stated, "I drove him to Avenue I right directly behind the

- 4 -

Western Apartments." According to Jesse, defendant said "he needed a ride to burn the mother f*** down and he wanted to go to the Western Apartments." Defendant exited the car with "the same gasoline can that he had gotten in the car with." Jesse did not notice any smell of gas. After dropping defendant off, Jesse "pulled around the block and continued to drive home to [his] house."

¶ 22 Jesse spoke to his brother by phone the next day, and defendant "was asking if I had seen his cell phone inside of my car." Coleman checked his car and "didn't see it." He saw defendant one other time at their mother's house and noticed that defendant was "pacing back and forth outside her front door" and "looked like he was very worried." Jesse said that defendant told him "he was smoked."

¶ 23 Coleman acknowledged that he spoke with the police three times but that he did not tell them about the gas can until the third interview. He claimed he was still afraid of his brother.

¶ 24 3. *Fire Investigation*

¶ 25 a. Michael Dettman

¶ 26 Sterling Fire Department Deputy Chief Michael Dettman testified that he was the incident commander at the scene and that there were approximately 25 to 30 firefighters present. Dettman testified that he was certified as a state fire marshal and that he had undergone over 120 hours of training, and was required to take ongoing education and recertification. No objection was made to his credentials.

¶ 27 After the fire was extinguished, Dettman inspected the building and noticed an amount of damage in the common hallways between the apartments. Based on his prior experiences in being inside the building, he said he knew "the amount of fuel load inside the

apartment and it lacks a significant fuel load for the amount of fire that we had within that apartment." Dettman said a "fuel load is anything that is combustible that can propagate fire and make it grow and take off." He testified that the most damage was on the lower level, but "the floor on the second level sustained heavy, significant damage. And the only thing really there was carpeting which doesn't have the heat release rate needed for the type of fire that we had."

¶ 28    Dettman said he had "some training on electrical outlets" as far as being the location of the fire's origin. The following exchange then occurred:

"Q. And what do you typically see when electrical outlet is the source of a fire?

A. If you have an outlet in the wall and it starts within that outlet, it is going to transfer vertically in the stud space, between the studs where the outlet is mounted.

In this case we didn't see anything like that or I didn't see anything or observe anything like that. So I did not suspect the outlet as being involved in the ignition."

¶ 29    He also testified that he had been trained to look for pour patterns. According to Dettman,

"Pour patterns are when an ignitable liquid is spilled, dumped, poured on a level flat surface. It will leave like an indentation once it is ignited because the amount of fluid or, or liquid in that area will settle to the lowest spot.

That lowest spot will have an overall heavier char to it than the rest of the area that doesn't have a flammable liquid on it."

¶ 30    Dettman was then asked whether he found any holes in the floor structure:

"Q. Do you recall if there were any holes anywhere within the flooring of this complex?

A. Yes, there was several holes.

Q. And what does that mean to you when you observe holes in the flooring?

A. Uhm, it has been weakened. And typically you find that from a fire underneath and not from a fire on top.

Uhm, in this case it was the fire on top that caused the weakened flooring.

I observed no damage or minor damage underneath so it was obvious and apparent that the fire had originated in that space."

¶ 31 He further examined the breaker box, which was located in the lower level directly under the stairs going up to the upper level. He said, "I noticed a large amount of water in the area but no significant fire damage to the box itself." He attributed this water to "[f]ire suppression activities from the firefighters." He did not notice any heavy damage to the breaker box but did not recall if any of the breakers were tripped.

¶ 32 On cross-examination, Dettman was asked about his qualifications and his familiarity with section 1033 of the National Fire Protection Association Code, which outlines the minimum qualifications for a fire investigator. Dettman said he could not remember the qualification requirements off the top of his head, but he said he had undergone the training and had the certificates. Dettman admitted that he did not author a report about his observations as commander on the scene.

¶ 33                    b. Cell Phone Recovered at Scene

¶ 34 Dettman said he found a silver Apple iPhone in a black and yellow OtterBox case in the south yard of the apartment buildings, about 20 feet from the front door. He gave the cell

phone to Sterling Police Department Chief of Police Edward Bartel. Bartel said the phone was password protected, but he was able to call 911 and obtain the phone number. He contacted the Statewide Terrorism and Intelligence Center, which provided the name and address of the phone's owner, who was identified as defendant. The phone was swabbed for DNA and sent to the Illinois State Police Forensic Science Laboratory and analyzed by Jennnifer Belna, a forensic scientist in biology and DNA. The Illinois State Police forensics DNA report from the phone swabs showed at least three male contributors who were unidentified. Belna testified that she then received a buccal swab sample from defendant and tested it. According to her, defendant was indicated as a potential contributor in the mix of DNAs. According to Belna, defendant's "male DNA profile would be expected to occur in approximately one in 210 octillion unrelated individuals." She explained that an octillion "has 27 zeros behind it, so it would be 210 with 27 zeros." She added, "[W]hat that means when I say those numbers is that if I just randomly picked someone off the street and I profile them, the probability that they are also included as a potential contributor is one in 210 octillion."

¶ 35 Fishbach was later shown the phone and believed it was defendant's, and she gave police the password. The police discovered selfie photos of defendant on the phone, along with photos of defendant and Fishbach and copies of defendant's tax documents.

¶ 36 A warrant was obtained for the phone's location records, and the cell tower data retrieved was given to City of Sterling police officer Kyle Wyckstandt, who used a program called CellHawk to determine the phone's approximate locations. An objection was raised to the admission of the CellHawk location data, which was overruled. According to Wyckstandt, CellHawk demonstrated that tower pings at 12:22 a.m. on June 1 locating the phone in an "area just to the west of 900 3rd Street, which would have been the Western Apartments." A text message

sent from the phone at 11:19 p.m. on May 31 asked defendant's mother to run him out to get gas.

¶ 37                                     c. Michael Poel

¶ 38        Illinois State Police Fire Marshal special agent arson investigator Michael Poel testified that he was called to the scene of the fire at 1:05 a.m. and arrived about an hour later. Poel testified that, in performing a fire inspection, he generally does a complete walk around the building, going from outside to inside. He tries to walk from the areas of the least amount of damage to the greatest, with the latter being the more likely site of the fire's origin. Poel "didn't observe anything right off the start that would affect what I was seeing as to the area of fire origin." He said that "[t]here was no evidence that the fire started on the outside" and "all fire appears to be coming from the interior of the structure."

¶ 39        Poel said he found holes in the floor on the two staircases inside the main entrance. According to Poel, the firefighters "had to stabilize a certain amount of the upper landing because there were holes burned through the floor." He said they then began "observing the fire patterns within this entryway area." He explained that, because heat rises, it will often create a "V pattern" against the wall. He also looks at whether there are patterns on the stairs showing whether they burned from above, as opposed to from below. Here, the stair railings had been burned. All of this "tends to indicate" that "there was some type of fire on that floor."

¶ 40        Poel explained that the next step was to determine where the fire had spread to, and how, as well as assessing its ignition source. He would look for potential electrical causes, such as a space heater, extension cord, or smoking material. Here, he examined electrical outlets in the hallway, the water heater area, and laundry area downstairs. He would expect to find charring at these locations if they were the origin of the fire, but he found nothing indicating an electrical cause of the fire. He noted that the type of outlets and electrical box in the building do not resist heat well

and often will become distorted or melted. That was not present here, and "the electrical box itself was still completely intact."

¶ 41      Poel concluded that burn holes in the foyer indicated that the fire was coming from above and burning through, as opposed to a fire underneath the floor and burning upward and through the floor. The plywood flooring material under the carpet showed burning from above, not below. The carpet on top is not the type of material that burns easily without an accelerant. Poel determined that "the greatest area of fire and fire origin was on the upper landing area as well as the stairs to the lower landing area."

¶ 42      Poel was also asked whether he searched for sources of the fire other than the two points of origin near the stairs. He answered in the affirmative, explaining that he was "in every apartment and looked, looked within all of the apartments; however, they did not appear to show any—The damage we observed was the result of the original file [*sic*] not being the origin of the fire."

¶ 43      Poel said that a fire canine was brought in and found positive indications on the charred wood of the upper landing. Samples were taken, "which showed terpenes." However, Poel explained, "terpenes are commonly found within wooden, particularly anything with pine or with plywood so that in and of itself was, did not spark our, our full interest because it just commonly occurs." These samples were also tested and contained no flammable or combustible liquids. Given these results, the canine's finding terpenes did not "move the needle" for him on an accelerant.

¶ 44      Poel testified that it was "possible that if an ignitable liquid, such as gasoline, was used to ignite a fire that there wouldn't be evidence of ignitable liquid." This could be the case because "it simply may have burned completely away," which does not happen often but is "not unusual." In addition, fire extinguishing operations would have put thousands of gallons of water

into the building "that may have washed any combustible liquids away." Gasoline could also evaporate from the heat of the fire. As the fire burns, it will heat up whatever ignitable liquid may be present, causing it to vaporize and burn. Here, at least enough burned away that no sample could be obtained. This suggested to Poel that it was "a very quick and very hot fire," which is unusual without something combustible beyond just carpeting.

¶ 45                                    4. *Defendant's Fire Expert*

¶ 46            Defendant called forensic fire consultant Marc Fennell as an expert witness. Fennell described what he termed as "insufficient use of scientific method by the State" and explained that he had employed the seven-step process found in National Fire Protection Association 921, Guide for Fire and Explosion Investigations (NFPA 921). Fennell explained that under this approach, called the systematic approach,

> "we collect data, we define problems, and then we develop hypotheses. And part of the hypotheses is, goes back to data collection.
>
> So data collection could be witness statements, for fires it could be burn patterns analysis, it could be looking at videos, body cams and all of that. That's data, that's data collection. And then we develop hypotheses on how this fire started.
>
> And so, if we can come up with a testable hypotheses [*sic*], then we may come up with the actual cause of the fire. But we also use that as origin too, so we have to have an origin before a cause.
>
> Those are the scientific methods in a nutshell."

According to Fennell, "[f]ire investigators would use that" provision, but "it is a guideline, so you, you are allowed to deviate [sometimes] but you have to be able to show, you know, how you

deviate and sometimes you can infer, which means assume."

¶ 47 Fennell was critical of the State, claiming that Poel did not look into all alternative origins. He also opined that Poel's analysis suffered from an expectation bias. He explained that some investigators come up with a conclusion before they have all the data. He said expectation bias is like using tunnel vision. He said that ruling out other causes of the fire requires testing and eliminating every other hypothesis.

¶ 48 On cross-examination, Fennell acknowledged that NFPA 921 is a guideline and that it is not required to be followed. He also agreed that no state law required it.

¶ 49 Fennell said he reviewed the fire report from Poel, which indicated two points of fire origins, one of the first floor landing and another on the second floor landing. Fennell disagreed with Poel that "there were two non-communicated separate fire origins." According to Poel, "I think they both do communicate based on the construction of that entryway." Fennell explained, "communication means do they talk to each other. I mean is there, is there a barrier between the two." He agreed that Poel's finding of the area of the fire's origin was also based upon eyewitness observations.

¶ 50 Fennell said he did not believe that the State's investigation was scientifically supported and that he would look at other sources for a potential ignition source. For example, he noted the reference to a potential gas smell noticed on the apartment property a few days before. It could not have been natural gas because there is no natural gas in the building, but Fennell said it could be methane from sewer gas, which can be explosive. Because of this potential, he felt that there should have been a "deep dive" in the sewer piping. This would strengthen a case by eliminating another possible cause. He later acknowledged that he had little information about whether the smell was, in fact, sewer gas.

¶ 51    He also pointed to a possible electrical origin. He stated, "Special Agent Poel said he could eliminate electrical. And I didn't see any documentation where that was done, other than he said he could." He testified further, "We do what is called arc mapping or arc survey, where we physically inspect every wire and we look for beads." There were also light switches, light fixtures, and receptacles, which are all part of the electrical. While Poel said he could eliminate those causes, Fennell said that he should have brought in a forensic electrical engineer to actually eliminate them.

¶ 52    Fennell explained that "flashover" from a very hot fire can cause accumulating heat to "bank down" until everything on the floor reaches ignition temperature. This can result in "a false positive, if you will, on the burn patterns." Fennell said there was no indication in the information that he reviewed showing that the State, specifically Poel, did any testing to rule out flashover. He also opined there was no documentation explaining how Poel eliminated electrical causes as a possible origin. Absent examination of all potential ignition sources, the fire cannot be classified as incendiary. Fennell thought there were no signs of an intentionally set fire and he thought the State's investigation was incomplete.

¶ 53    Fennell was examined on what he knew concerning the evidence of defendant having brought a can of gasoline to the building:

> "Q. Would your opinion about origin of this fire change if you knew that somebody showed up at that building with a can of gas?
>
> A. That would be new data so that would be another analysis that I would have to do.
>
> Q. Wasn't that data in the discovery that you received?
>
> A. There was an allegation but—

- 13 -

Q. Okay.

A. —yes.

Q. So it was in there?

A. It was there, yes.

Q. Okay.

And you discounted it?

A. There was no test that came back positive for that.

* * *

Q. So you just discounted that somebody said he went there, that the Defendant went there with a can of gas?

A. There is no physical evidence to support it. Correct, sir."

¶ 54 When asked about the sample testing from the fire scene, Fennell said he "would expect to find samples come back positive for accelerant." However, he acknowledged that fire departments put out fires with water and that water can wash away the source of a fire or at least dilute it. Fennell further admitted that in his prior investigations of fires that were intentionally set, there were times when they were set with gasoline, yet no gasoline was found in the samples. He acknowledged that he knew of fires determined to have been fueled by gasoline, but where no confirming evidence of gasoline had been found.

¶ 55                    5. *Verdict*

¶ 56 Defendant was convicted on counts I to III (aggravated arson), count IV (residential arson), and counts VIII to X (first degree murder).

¶ 57                    C. Posttrial Motions and Sentencing

¶ 58 Defendant moved for judgment notwithstanding the verdict and for a new trial,

arguing that the State failed to prove his guilt beyond a reasonable doubt, that he was denied due process and equal protection of the law, that he did not receive a fair trial under various articles of the Illinois and United States Constitutions, and that he received ineffective assistance of counsel. He further contended that he was prejudiced because "on the first day of trial, while the entire venire was sitting in the courtroom, court security walked with and next to the Defendant into the courtroom from a non-public door in the rear of the courtroom, as to give the venire the appearance that the Defendant was in custody."

¶ 59       Defendant's motion was denied.

¶ 60       During the sentencing hearing, the trial court accepted the presentence investigation report and heard arguments of counsel. It then accepted victim impact statements from Faith Walker, parent of S.R.W., and the minor S.R.W.'s grandmother (who had recently died), which was read on her behalf. The grandmother's statement was short and discussed her bond with S.R.W. and how much she missed S.R.W. and concluded with, "The monster that killed [S.R.W.] took all of that away from me that day."

¶ 61       Faith's statement mentioned how much she missed her daughter and how she now suffered from anxiety issues, including posttraumatic stress disorder, and concluded with her remark that defendant had "single-handedly destroyed four families that night": C.R.S.'s, S.R.W.'s, Carrie Hose's, and his own.

¶ 62       Alma Walker, C.R.S.'s mother, also gave a statement about her life without her daughter and the type of person her daughter was before she died, and how she herself had spent "six weeks in intensive ICU, learning how to breathe, talk, and walk again." She concluded by saying that "a monster like [defendant] should [never] be able to walk the streets freely again."

¶ 63       Finally, attorney James Mertes, who was an attorney representing some of the

victims' estates and Alma civilly, read a statement in which he provided a glimpse of who each of the victims might be today. He further spoke of the final sounds of the children's voices as the firefighters attempted to rescue them, as recorded by the firefighter's body cameras. He concluded by saying that "[t]he impact of these separate occurrences, each suffered as the result of one man's heinous acts, cannot be expressed in spoken words." He added,

> "[Defendant] murdered three beloved daughters. He maimed and scarred three others.
>
> Justice cannot be done in this courtroom.
>
> Not today.
>
> Not in this case.
>
> The monstrosity of [defendant's] crimes will escape the farthest reach of justice.
>
> No words could ever describe the full measure of the losses that he inflicted.
>
> The world was just a better place when [S.R.W.], [C.R.S.] and Carrie [Hose] were in it."

¶ 64        Defendant was sentenced to life in prison for each murder and was further sentenced to 30 years' incarceration on each of the three aggravated arson counts and 15 years on the residential arson count. All sentences were imposed consecutively, resulting in a cumulative sentence of three life sentences plus 105 years' incarceration.

¶ 65        Defendant filed a motion to reconsider his sentence, arguing that the trial court (1) "did not take into consideration each and every factor in mitigation," (2) "placed insufficient weight on the factors in mitigation," and (3) imposed a sentence that was "excessive in light of the spirit and purpose of the law." Defendant's motion was denied.

¶ 66    This appeal followed.

¶ 67                                II. ANALYSIS

¶ 68    Defendant argues that (1) the State failed to prove his guilt beyond a reasonable doubt; (2) he received ineffective assistance of counsel relating to the admission of various evidence; and (3) he received ineffective assistance of counsel at his sentencing.

¶ 69                        A. Sufficiency of the Evidence

¶ 70    In *People v. Jones*, 2023 IL 127810, ¶ 28, the supreme court reiterated the familiar standard applicable to a challenge to the sufficiency of the evidence:

> "In reviewing the sufficiency of the evidence in a criminal case, this court asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Id.* All reasonable inferences from the evidence must be drawn in favor of the State. *Id.* A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt."

¶ 71    In weighing the evidence, "a trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* ¶ 32 (citing *Hardman*, 2017 IL 121453, ¶ 37). Thus, we review the defendant's convictions under a manifest weight of the evidence standard. *People v. McLaurin*, 2020 IL 124563, ¶ 22.

¶ 72    According to defendant, the State failed to meet its burden in proving arson beyond

a reasonable doubt. Section 20-1(a)(1) (West 2020) provides that "[a] person commits arson when, by means of fire or explosive," he knowingly "[d]amages any real property, or any personal property having a value of $150 or more, of another without his or her consent." Arson is classified as a Class 2 felony (*id.* 20-1(c)) and provides the foundation for the State's charges of murder in this case. Defendant's argument focuses on three main points. First, that the State's witness Fishbach was not credible because she admitted to being intoxicated and having used drugs on the evening of the fire. Second, he argues that both Fishbach and Jesse did not want to be involved in the investigation and delayed revealing their full information to the police. Third, defendant contends that the State's fire witness did not establish who, if anyone, caused the fire or where defendant was when the fire started.

¶ 73        These arguments amount to little more than an attempt to reargue the evidence. Defendant raised each of these points during cross-examination when attacking the credibility of Fishbach and Jesse and further made similar arguments to the jury during closing arguments. Here, the State admittedly presented its case based on circumstantial evidence, which it is entitled to do. It is well settled that "the opportunity for commission of an arson, the motive inducing an arson and the identity of a person accused of arson may all be established through circumstantial evidence because the crime of arson is, by its very nature, secretive and usually incapable of direct proof." *People v. Dukes*, 146 Ill. App. 3d 790, 794 (1986); *People v. Nasser*, 223 Ill. App. 3d 400, 404 (1991). Moreover, a conviction may be sustained upon circumstantial evidence as well as direct evidence, "it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." *Dukes*, 146 Ill. App. 3d at 794 (citing *People v. Williams*, 66 Ill. 2d 478, 484-85 (1977)).

¶ 74 Our review of the trial testimony reveals a substantial amount of circumstantial evidence against defendant. Two witnesses testified that defendant stated he planned to burn down the apartment complex; defendant had his brother drive him to the apartment complex—with a gasoline can in tow—shortly before the fire is believed to have started; defendant's brother dropped him off near the apartment complex, again in possession of the gas can; defendant's girlfriend testified that a gas can was missing from her garage; and defendant's cell phone was found roughly 20 feet from the apartment complex doors. Jesse testified that defendant called him the next day asking if he had left his phone in Jesse's vehicle. Additionally, Fishbach identified the phone as likely that of defendant, gave the police the phone's passcode, which on opening revealed selfie photographs of defendant and photographs of himself and Fishbach, and tax documents belonging to defendant. The police also dialed 911 on the phone, which led to confirmation that defendant was the owner. Finally, Jesse testified that he saw defendant shortly after the fire and defendant appeared uneasy and told Jesse he "was smoked."

¶ 75 Defendant suggests that someone else, either Fishbach or Jesse, may have set the fire. However, "[s]peculation that another person might have committed the offense *** does not necessarily raise reasonable doubt as to the guilt of the accused." (Internal quotation marks omitted.) *Nasser*, 223 Ill. App. 3d at 404.

¶ 76 While defendant might question various aspects of each witness's testimony, the trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from it. *People v. Brown*, 2013 IL 114196, ¶ 48. On review, we view the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that all elements were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). We will not reverse a conviction unless the evidence is "unreasonable,

improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Based on a complete review of the record, we conclude that the evidence is sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 77                           B. Ineffective Assistance

¶ 78        Defendant acknowledges he has forfeited several issues relating to the admission of evidence but argues that we may nevertheless consider these issues under the doctrine of ineffective assistance of trial counsel. We employ the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to evaluate a claim of ineffective assistance of counsel. *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Peterson*, 2017 IL 120331, ¶ 79. "A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *People v. Webb*, 2023 IL 128957, ¶ 21.

¶ 79        As is well settled, a defendant who fails to preserve an issue with a contemporaneous objection and in his posttrial motion forfeits review of such issues unless he can establish ineffective assistance of counsel or plain error. *People v. Ortega*, 2021 IL App (1st) 182396, ¶ 63.

¶ 80                           1. *Admission of Expert Testimony*

¶ 81        Defendant argues that defense counsel was ineffective for failing to object to the testimony of States' witnesses, Poel and Dettman. According to defendant, trial counsel should have objected to Poel's opinions because they lacked scientific basis and relied on discredited

methodology as to the origins of the fire. He further argues that Dettman was unqualified as an expert to offer opinions and that he relied on discredited arson indicators, including Poel's conclusions.

¶ 82       In Illinois, there is no predetermined formula for determining how an expert acquires specialized knowledge or experience as basis for qualifying to testify as expert witness; the expert can gain such through practical experience, scientific study, education, training, or research. *Thompson v. Gordon*, 221 Ill. 2d 414, 428-29 (2006). A witness is qualified to give expert testimony if, "because of [the witness's] skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person." (Internal quotation marks omitted.) *People v. Davis*, 335 Ill. App. 3d 1, 17 (2002). "The qualified expert's opinion must be based on scientific theories that have gained general acceptance in his or her field." *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 50. However, "[s]pecialized formal training is unnecessary, and experience alone may qualify a person as an expert." *Davis*, 335 Ill. App. 3d at 17. The expert's "knowledge [must be] based on information of the type reasonably relied on by experts in the [witness's] field." *Id.* at 18. "The expert must offer the basis for his or her opinion using a reasoned analysis or the testimony is rendered invalid." *Jackson*, 2017 IL App (1st) 142879, ¶ 50.

¶ 83       The party seeking to have an expert testify bears the burden of establishing the expert's qualifications to render an opinion. *People v. Park*, 72 Ill. 2d 203, 209 (1978). Per Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), a witness is qualified to give expert testimony if "(1) the witness may be of assistance to the trier of fact; (2) the witness is qualified to give the testimony sought; and (3) the testimony sought is supported by adequate facts, data, or opinions." *Ruffin ex rel. Sanders v. Boler*, 384 Ill. App. 3d 7, 18 (2008) (citing Michael H. Graham, Cleary and

Graham's Handbook of Illinois Evidence § 702.1, at 610 (7th ed. 1999)).

¶ 84　　　　Examining Poel's qualifications, he served as a special agent for the Illinois State Fire Marshal's Office, Division of Arson Investigation, for just under 19 years. He held certifications with the fire marshal's office as an arson investigator, and he also had certifications from the International Association of Arson Investigators and the National Association of Fire Investigators. He further held a certification as a firefighter and had attended "numerous training [courses] at the National Fire Academy and through these various organizations over the years." He said, as of June 1, 2020, his training was current. He also testified that he attended several investigation classes and firefighting classes, "whether it be through the Illinois Fire Service Institute or through the National Fire Academy in Emmitsburg, Maryland." He also testified that he began working as a volunteer firefighter at the age of 16 and had held every position of rank at the fire department, including chief of the Port Byron Fire Department. He served as a firefighter for roughly 27 years. He estimated that he had spent over 3,000 hours training in either fire service or fire investigation.

¶ 85　　　　We note that Illinois Rule of Evidence 702 does not require the trial court to "certify" an expert before allowing that witness to offer opinion testimony. *People v. Pingelton*, 2022 IL 127680, ¶ 62. Regardless, Poel was tendered to the defense for questioning and asked whether he recalled the requirements for becoming a fire investigator. Defense counsel did not object, and defendant now claims that the failure to do so constituted ineffective assistance. We disagree. Under the standards of Rule 702, Poel was certainly qualified as an expert based on his "knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Even if an objection had been made, the trial court would have acted well within its discretion in receiving expert testimony from Poel. See *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016

IL App (1st) 151864, ¶ 73 ("The decision of whether to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.").

¶ 86     Beyond Poel's qualifications to offer expert testimony, defendant also contends that his opinions were substantively defective, as they lacked a scientific basis and followed discredited methodology. Thus, defendant contends that his trial counsel was ineffective for failing to object to them. Again, we disagree. Even if an objection to such opinions had been lodged, the trial court would have been well within its discretion to overrule it. The jury heard the criticisms of Poel from defendant's expert, Fennell, and it was for the jury to assess the credibility of each witness. Fennell's criticisms went to the weight of Poel's opinions rather than their admissibility. See *Petraski v. Thedos*, 382 Ill. App. 3d 22, 31 (2008) ("The factual basis for an expert's opinion generally does not affect his standing as an expert; it is for the [trier of fact] to determine the weight of the opinion.").

¶ 87     We do not believe defendant was prejudiced by his attorney's failure to object to Poel's testimony. Beyond the fact that the trial court could have admitted Poel's testimony even if an objection had been raised, we do not believe that Poel's testimony would likely have affected the outcome of this case in light of the other strongly incriminating evidence against defendant. In determining whether a defendant was prejudiced by a counsel's deficient performance, "prejudice" exists only when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, and a "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *People v. Frazier*, 2017 IL App (5th) 140493, ¶ 20. The evidence here gave defendant a motive, reflected his incriminating statements about his intentions, and placed him at the scene in possession of a gasoline can.

¶ 88     As for counsel's failure to object to Dettman's testimony, we note that he worked

for the City of Sterling Fire Department as deputy fire chief and had been with the department for 25 years. He described his training as a "state mandated investigation training," which "consisted of 120 hours and ongoing education required every four years for recertification." At the time of the fire, he had completed a state-mandated fire investigation training and undergone ongoing training every four years and had been certified in fire investigation since 2005. His duties included fire investigation. Moreover, his involvement in the case was as an occurrence witness. He assumed the role of incident commander upon his arrival at the scene and that he physically inspected the apartment complex premises once the fire was extinguished. Dettman's testimony described what he observed, including burn patterns, the condition of outlets and electrical panels, as well as the condition of the floor in the entranceway stairwells. On cross-examination, Dettman admitted that he could not recall the training requirements for his fire certifications but said that he nonetheless undertook the training.

¶ 89          Dettman was entitled to testify as to what he saw during his postfire inspection (*People v. Heineman*, 2023 IL 127854, ¶ 75 ("A lay witness opinion must be based on the witness's personal observations and recollection of concrete facts.")). Dettman described the condition of the electrical outlets, the condition of the breaker box, the presence of holes on the floor, and the nature of the damage throughout the complex, all of which he was entitled to do based on his observations. We agree that Dettman's largely factual testimony crossed into the realm of opinion on a few occasions. However, a witness will be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to laypersons and where such testimony will aid the fact finder in reaching its conclusion. See Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 90          Furthermore, for the reasons stated above, even if an objection from defense

counsel could have kept the jury from hearing the few parts of Dettman's testimony that can be characterized as opinion, exclusion of such testimony would have had no impact on the outcome here in light of the other substantial incriminating evidence.

¶ 91                          2. *Cell Phone Location Data*

¶ 92          Defendant also raises two issues concerning the admission of the Verizon cell phone data: (1) the adequacy of the Verizon business records certification under Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018) and (2) the interpretation of that data by Wyckstandt via the CellHawk program. Defendant attacks both the admission of the evidence and the adequacy of his attorney's resistance to it.

¶ 93          We find the import of this evidence to be so lacking in consequence that we will deal with the issue summarily. The only possible significance of this evidence is not to show that defendant was at the location of the fire, but that his *cell phone* was. However, other evidence clearly established that defendant's cell phone *was* at the location of the fire, so the presence or absence of the other information complained of can have had no effect on the case. While defendant argues that the cell phone data purported to show the movement of his phone over time, including the time of its arrival at the scene, this does not add to the impact of the contested evidence. Knowing that defendant's cell phone *was* at the scene at about the time of the fire, it had to have arrived there at some point. While defendant might imply that the cell phone was planted at the scene by the true arsonist to implicate him, he cannot explain why such a person would have placed it there at a time other than when the fire was set. In other words, arrival of the phone at the time of the fire is consistent with both defendant's guilt and his alternative hypothesis.

¶ 94          We reject defendant's arguments on both issues.

¶ 95                              3. *Sentencing*

¶ 96	Next, defendant argues that his trial counsel was ineffective for failing to address two points during his sentencing: admission of victim impact statements and application of section 5-8-4(f)'s upper limit on the imposition of consecutive sentences.

¶ 97	a. Victim Impact Statements

¶ 98	Defendant first argues that his counsel rendered ineffective assistance by not objecting to reading of the various victim impact statements at sentencing, including the statement of a legal representative of the two deceased minors.

¶ 99	It is unclear whether a hypothetical objection from counsel would have been well founded. Victims are afforded the right to be heard at sentencing, and this right extends not only to victims, but to their representatives. According to section 6(a) of the Rights of Crime Victims and Witnesses Act (725 ILCS 120/6(a) (West 2024)),

> "A crime victim shall be allowed to present an oral or written statement in any case in which a defendant has been convicted of a violent crime ***. The court shall allow a victim to make an oral statement if the victim is present in the courtroom and requests to make an oral statement. An oral statement includes the victim or a representative of the victim reading the written statement. The court may allow persons impacted by the crime who are not victims under subsection (a) of Section 3 of this Act to present an oral or written statement. A victim and any person making an oral statement shall not be put under oath or subject to cross-examination. The court shall consider any statement presented along with all other appropriate factors in determining the sentence of the defendant or disposition of such juvenile."

¶ 100	This court has cautioned that *Payne v. Tennessee*, 501 U.S. 808 (1991), which

established the admissibility of victim impact evidence at sentencing, "does not give the prosecution a free rein to introduce and argue anything it wants." (Internal quotation marks omitted.) *People v. Richardson*, 196 Ill. 2d 225, 232-33 (2001), *superseded by statute as stated in People v. Hestand*, 362 Ill. App. 3d 272, 280-81 (2005)). Thus, in the event that evidence is introduced that is so unduly prejudicial that it renders the hearing fundamentally unfair, the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) provides a mechanism for relief. *Payne*, 501 U.S. at 825. Whether the evidence here rises to that level is somewhat dubious.

¶ 101 Regardless of whether counsel was ineffective for failing to object to this evidence, we do not believe defendant can establish that he was prejudiced by it. Even if the issue had been preserved, it is well settled that a sentencing judge's reliance on an improper consideration does not always require a reversal of the sentence. See *People v. Bourke*, 96 Ill. 2d 327, 332 (1983); *People v. Sterling*, 2025 IL App (4th) 240917-U, ¶ 31. Where, as here, it can be determined from the record that the weight placed on an improperly considered factor was so insignificant that it did not lead to a greater sentence, the sentence need not be disturbed. See *Bourke*, 96 Ill. 2d at 332-33 ("[W]e are able to determine here that the length of defendant's sentence was not increased based on the circuit court's [improper] statement that defendant had received compensation for committing these offenses.").

¶ 102 Upon reviewing the statements together with the trial court's ruling, we conclude that there is nothing in the record to show that the court relied on or considered these victim impact statements. The court's comments when imposing sentence never mentioned the victim impact statements. Because defendant has failed to demonstrate prejudice from his ineffective assistance claim, he likewise cannot satisfy the required prejudice under the doctrine of plain error, which he invokes summarily in his reply brief. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). We therefore

conclude the issue has been forfeited.

¶ 103                                   b. Consecutive Sentences

¶ 104          Defendant next contends that the trial court erred by imposing his sentences on all convictions consecutively. Recall that the court imposed life sentences on defendant's three first degree murder convictions, 30 years' imprisonment on each of his three aggravated arson convictions, and 15 years' imprisonment on his residential arson conviction. The court ordered that all sentences were to be served consecutively. Sentences must be imposed consecutively where "[o]ne of the offenses for which the defendant was convicted was first degree murder." 730 ILCS 5/5-8-4(d)(1) (West 2024). As noted above, defendant had one or more first degree murder convictions, so it is undisputed that the law required his sentences be imposed consecutively.

¶ 105          While consecutive sentences are mandatory here, defendant notes that section 5-8-4(f)(2) imposes an upper limit on the total years to be served on consecutive sentences:

>          "[T]he aggregate of consecutive sentences for offenses that were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective shall not exceed the sum of the maximum terms authorized under Article 4.5 of Chapter V for the 2 most serious felonies involved, but no such limitation shall apply for offenses that were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." *Id.* § 5-8-4(f)(2).

¶ 106          There is no dispute that defendant's actions were part of a single course of conduct, with no substantial change in the nature of his criminal objective. Therefore, our focus is on which of the felonies we are to consider in interpreting and applying section 5-8-4(f)(2)'s cap on consecutive sentences. Defendant argues that his two most serious felonies are two of his first

degree murder convictions, for which he received a life sentence. If so, his other sentences could not be imposed consecutively. The State, on the other hand, argues that the life sentences are not considered in calculating the cap called for under section 5-8-4(f)(2). Because the maximum possible sentence for the two most serious of the other convictions is 60 years for each offense, the State argues that defendant's aggregate sentence of 105 years' imprisonment is within the 120 year cap.

¶ 107 According to *People v. Terry*, 183 Ill. 2d 298, 304-05 (1998), a natural life sentence is not a term of years. There, the court was considering whether extended-term sentencing (which is triggered by certain aggravating factors) was appropriate with a life sentence. Finding that the life sentence had no term, the court concluded that a life sentence cannot be extended under section 5-8-2; instead, the "extended-term statute should be interpreted as applicable to the next most serious offense of which the defendant was convicted." *Id.* at 305.

¶ 108 Appellate cases have since applied *Terry* to other sentencing provisions, such as section 5-8-4(c) concerning the imposition of permissive consecutive terms (730 ILCS 5/5-8-4(c) (West 2024)). See *People v. Foster*, 322 Ill. App. 3d 780, 788 (2000) (relying on *Terry*, the court held "we will not consider first degree murder with a sentence of natural life as one of the most serious felonies involved"); *People v. Saunders*, 235 Ill. App. 3d 661, 675 (1992) (same as *Foster*). This precedent would lead us to conclude that we must not consider defendant's life sentences in calculating his maximum possible sentence for purposes of section 5-8-4(f)(2)'s cap on consecutive sentences. Consequently, we must examine defendant's other felony convictions and determine which two of them constituted his most serious felonies.

¶ 109 Defendant's next most serious convictions are for aggravated arson, which is a Class X felony. 720 ILCS 5/20-1.1(b) (West 2020). The maximum sentence of imprisonment for

a Class X felony is "not more than 30 years," and for an extended term, "not more than 60 years." 730 ILCS 5/5-4.5-25(a) (West 2024). The maximum terms which form the cap on consecutive sentences under section 5-8-4(f)(2) include the maximum extended sentence. *People v. Schneider*, 2024 IL App (4th) 230524-U, ¶¶ 66, 68 ("[W]e calculate the maximum aggregate prison sentence that defendant can serve for a single course of conduct based on the maximum authorized extended-term sentence."). Consequently, the "maximum terms authorized" for defendant's two most serious convictions—excluding the life sentences for first degree murder—is 60 years per offense, or 120 years in total. Accordingly, the trial court's imposition of consecutive sentences totaling 105 years in the aggregate was not improper. There being no basis for defendant's trial counsel to have objected to the aggregate length of his consecutive sentences under section 5-8-4(f)(2), his counsel cannot have been ineffective for failing to do so. Because defendant also frames this issue in the context of plain error, we find that there was no error, and therefore no plain error.

¶ 110                                     III. CONCLUSION

¶ 111          For the reasons stated, we affirm the trial court's judgment on all issues.

¶ 112          Affirmed.